THE LEHIGH VALLEY RAILROAD COMPANY

*v.*

THE SOCIETY FOR ESTABLISHING USEFUL MANUFACTURES.

Equity has jurisdiction (and for that purpose may enjoin the further prosecution of suits at law) in a case which involves the relative rights, under their charters, of two corporations to the use of the waters of the same stream or streams; and such jurisdiction exists on the ground of both public and private necessity. In such cases, equity is not only the appropriate forum, but the only one where adequate relief in the premises can be administered.

Bill for relief. On motion to dissolve injunction, on bill, answer and affidavits annexed to each.

NOTE.—The reporter is indebted to the courtesy of *H. C. Pitney, esq.*, for a pamphlet copy of the following opinion-of *Chancellor Isaac H. Williamson,* which completes to the present time the legal history of this celebrated case. No apology for its insertion here is deemed necessary, since it has become so scarce as to be virtually inaccessible to the profession and public:

IN CHANCERY, NEW JERSEY.

*Between the Society for Establishing Useful Manufactures and others, complainants,*
    *and*
*The Morris Canal and Banking Company, defendants.*
}  On Bill for Injunction.

This bill was filed by the complainants for the purpose of establishing their right to all the water of the Passaic river at Paterson, and to restrain the defendants and their agents from diverting, in anywise,

10

Lehigh Valley R. R. Co. *v.* Society &c.

*Mr. H. C. Pitney* and *Mr. J. D. Bedle,* for the motion.

*Mr. T. N. McCarter, Mr. A. B. Woodruff* and *Mr. F. T. Frelinghuysen, contra.*

THE CHANCELLOR.

The complainants, the Lehigh Valley Railroad Company, are, under lease from the Morris Canal and Banking Company, the proprietors of a line of canal, of about one hundred miles in length, from the Delaware to the Hudson. The defendants, the Society for Establishing Useful Manufactures, were incorporated in 1791. The charter of the canal company was granted in 1824. At and prior to the latter date, the society claimed to be entitled, as riparian owners, to all the waters of the Passaic river at the great falls at Paterson, and they then, as they have ever since, derived revenue from the rents received for the use of the water as

any of the waters of the said river, or of the streams of water tributary thereto, and leading to the same, from the bed of the said river, so as to prevent the same, or any part thereof, from flowing along that part of the bed of said river where the said waters are carried off therefrom by "The Society for Establishing Useful Manufactures," at Paterson, for the purpose of supplying manufacturing establishments at that place.

The cause was argued at Trenton, at the term of January last past, by G. Wood and Ph. Dickerson, esqs., of counsel with complainants, and D. B. Ogden and Jos. C. Hornblower, esqs., of counsel with defendants, and at the term of April last past the following opinion was delivered by *His Excellency Isaac H. Williamson, esq.,* chancellor.

When this motion for an injunction was first made, I was struck with the importance of the case itself, as I perceived it involved questions of great magnitude, affecting the vital interests of the parties, and of great public concern, and I therefore thought it right, not to act on the *ex parte* application of the complainants, but to direct notice to be given of the motion—and, in the hope that I might obtain the assistance of the chief justice, which would have been very gratifying to me, the motion was directed to be made at this place, on the first day of the then next regular term of this court; and I cannot but regret, as well on my own account as that of the parties, that I have been disappointed in that hope. But I feel it a matter of great satisfaction that the merits of the motion have been so fully and ably argued as very much to have lessened, in my mind, the difficulties of the case.

"The Society for Establishing Useful Manufactures" was incorporated in 1791. The object of the legislature, in granting the charter, is

a motive power to the factories in Paterson.    Up to 1836,
when an agreement was made between the canal company
and the society in regard to the water, the latter claimed
the right to use all the water 'of the Passaic at the great
falls, without diminution or alteration.    The canal com-
pany appear from the beginning to have insisted on the
right to use the water for their purposes to the extent to
which they have used it, and, alleging that they supplied the
place of all they used, with other water from their sources
of supply (and even supplied more), so that the quantity of
water at the falls at Paterson was, in fact, undiminished,
insisted that the society had no cause for complaint.    The
society, in 1829, before the works of the canal company were
completed, apprehending that those works would, when in
operation, injuriously affect their supply, filed their bill
in this court against the canal company, for an injunction
to restrain the latter from diminishing it.    The injunction

clearly expressed on the face of it; it was "for the purpose of estab-
lishing a company for carrying on the business of manufactures in this
state."    At this time our national government was but in its infancy;
few articles of any description were manufactured in the United
States, and we were dependent almost entirely upon foreign nations
for articles of the first necessity; the consequences of which were
sensibly felt and deeply deplored.    It was under such circumstances
that some individuals conceived the laudable and patriotic design of
combining and employing a large capital, by means of an act of incor-
poration, in the hazardous and untried experiment of manufacturing
useful articles for domestic consumption; and, under the flattering
auspices of one of the first and most distinguished men of that day
(Alexander Hamilton), and to whose memory this country owes an
everlasting debt of gratitude for his invaluable public services, the
association was founded and the charter granted.

The plan contemplated was every way worthy of its early patrons.
It was one of no common magnitude.    It was not to establish a com-
pany for the mere purpose of manufacturing some particular descrip-
tion of goods; but it was to lay the foundation of *a great emporium of
manufactures,* for all such commodities or articles as should not be pro-
hibited by law.    To effect this grand and interesting object, to encour-
age a spirit of enterprise, and command the capital necessary for the
purpose, the most extensive privileges were granted.    The charter was
in perpetuity; the original capital limited at one million of dollars,
with liberty to acquire and hold real and personal property to an
amount in value not exceeding four millions of dollars; the seat of the
intended establishment was not fixed by the legislature, but the society

was refused, on the ground that they had sustained no actual injury, and that the canal company protested that their works not only would not diminish the supply, but, on the contrary, would increase it. *Opinion of Chancellor I. H. Williamson.* [See note.]

In 1830, they filed another bill, alleging that a considerable part of the canal company's works had been completed, and that experiment had satisfied them that the effect of the operation of those works would be injurious to them in diminishing their supply, and also by commingling other water with that of the Passaic and its tributaries. The injunction applied for on this bill was also denied. It was refused by Chancellor Vroom, on the ground that, as to the commingling of the water, it did not appear that the foreign water was not as good as that of the Passaic, and as to the diversion, the canal company disclaimed any intention to diminish the supply, but presumed that the effect of their

were left free to locate it in any part of the state ; and provision was made for incorporating the district, not exceeding six miles square, by the name and title of " the corporation of the town of Paterson."

It was manifestly the expectation of the legislature who granted the charter, that the society would themselves carry on the business of manufacturers, and that a part of their large capital would be employed for that purpose. It was their capital, their example and exertions, which were looked to, to lay the foundation of the contemplated manufacturing town, by diffusing a general spirit of enterprise and active industry, and by drawing around them a great manufacturing population. By the second section, their original capital is " to be employed in manufacturing or making all such commodities or articles as shall not be prohibited by law, and, to that end, in purchasing such lands, tenements and hereditaments, and erecting thereupon such buildings, and digging and establishing such canals, and doing such other matters and things as shall be needful for carrying on a manufactory or manufactories of the said commodities or articles."

Soon after the passing of the charter, the society was organized, and in 1792 a situation at the great falls of the Passaic river was made choice of " as a suitable place for the principal seat of their said manufactures." They purchased the old mill seat and upwards of seven hundred acres of land, with the bed of the river both above and below the falls. They expended large sums of money to create a great water-power to carry on their manufacturing operations with. They constructed a canal or water-course, a short distance above the falls, to lead the waters of the Passaic river through the lands of the society and return them again into the bed of the river. They also threw a

works would rather be to increase it.   *Society &c.* v. *Morris Canal &c. Co., Sax.* 157.

In 1836, the canal company was before the legislature seeking authority to conduct into their canal the waters of Long pond or other waters that might be necessary for the supply of their canal, and for that purpose to construct a navigable feeder and take tolls thereon.   The society appeared in opposition, but withdrew their objection upon the making of an agreement between them and the canal company, by which it was provided that they should have a certain amount (three square feet) of water from the canal, to be discharged at a place therein designated, and the canal company were to be at liberty to divert all the streams tributary to the Passaic, and to use the waters of those streams as they might think proper.   The supplement was passed.

In 1845, a bill was filed in this court by the canal company to restrain the society from tearing down a permanent

dam across the river and formed a sluice or race-way, by which the water was carried into a large basin or reservoir, from which it was to be carried into the canal which they had constructed, and such others as they should construct, for multiplying sites for manufacturing establishments; and they thus appropriated, by occupancy, the waters of the Passaic to the purposes of the institution.

In 1793, the society erected buildings and established a cotton factory, and, in 1794, they established a printing, bleaching and dye-shop.   They employed a number of manufacturers and other hands, and carried on the business of manufactures for some years; but, such was then the situation of the country, and so many were the difficulties which the society had to encounter, that this institution, with its large capital and extensive privileges, was unable to support itself; and the directors, after sinking a great part of their capital stock, found it necessary to discharge their numerous hands—to sell off their raw materials and other personal property—and entirely to discontinue the business of manufactures; and they have not since resumed it; nor is any part of their capital employed or used in manufacturing business.   They never abandoned their water-works or other improvements which they had constructed; and, in 1807, they constructed a second canal or water-course, and, in 1827, a third; and the grounds around and adjacent to those canals, now form numerous valuable sites for mills and factories.

Many of the members having become discouraged by the misfortunes and losses of the society, sold out, and in 1814, Mr. Colt, the present enterprising governor of the society, purchased up, at a depreciated price, a large proportion of the shares, called the directors together,

wall, which the former had built in place of the gates,
through which, after the agreement of 1836, the three
square feet of water had been furnished to the society.   A
preliminary injunction was granted.   The society answered
the bill and filed a cross-bill for specific performance of the
agreement.   In their bill the canal company stated that to
furnish the three feet of water, according to the agreement,
would create a current which would destroy the usefulness
of their canal; and they also insisted that the agreement
was not binding on them because it was made subsequently
to the giving of what is known as the Dutch mortgage on
the property and franchises of the canal company, under
foreclosure of which mortgage and a new organization of
the company the then complainants claimed title, free, as
they insisted, from the obligation of the agreement.   Motion
was made to dissolve the injunction granted to the canal
company and for an injunction on the cross-bill.   The chan-

---

and resumed the operations of the society; but their operations since
that period have been principally confined to the construction of works
to increase their water-power, and the number of sites for manufactur-
ing establishments; and, instead of carrying on manufactures them-
selves, they have leased out to individuals and companies, upon rent,
sites with water privileges, for manufacturing establishments.   Under
that management, the business of the place has flourished, and so far
has the society fulfilled the expectations of the legislature, that Pater-
son has become decidedly the greatest manufacturing town in the
state, and one of the largest in population and active industry; the
town is supported, and has risen to its present importance, entirely by
manufactures and the various trades growing out of them, and the
inhabitants have become incorporated under the provisions of the
charter to the society.   From the present flourishing condition and
rapid increase of the population, industry and wealth of the district,
the state is realizing all the important benefits and consequences which
were fondly anticipated by the first patrons of the institution.

In 1824, "The Morris Canal and Banking Company" was incorpo-
rated; and, most unfortunately, conflicting claims are set up by the
respective corporations to the use of the waters of the Passaic river
and its tributary streams, which have given rise to the present suit.

The Morris Canal and Banking Company was incorporated "for the
purpose of constructing a navigable canal to connect the waters of the
Delaware river, near Easton, with the tide-waters of the Passaic river,
and passing through the county of Morris," and, in July, 1825, the
company commenced the excavation of their canal, which, ever since
that time, has been in continual progress: but that part of it which

cellor (Halsted) denied both motions. *Morris Canal &c. Co.*
v. *Society &c.*, 1 *Hal. Ch.* 203.

In 1846, the society brought, in the Passaic circuit court,
an action of ejectment against the canal company to recover
possession of a lot of land said to include the premises on
which the wall before mentioned was erected. The suit was
based on the ground that the company had no title to the
land, that no agreement had been made by them therefor
with the proprietors of the land (the society), and that there
had been no legal assessment and payment of damages for
it. It was decided in 1854. The result was adverse to the
society, the court holding that the original charter of the
canal company, under which the lands were taken, gave
them the right to enter upon and take lands required for
their work without first making compensation, that the
enactment was constitutional, and that, although no com-
pensation or assessment was ever made, the owner of the

---

approaches nearest to the town of Paterson, was not finally located
till the year 1826. A great part of the excavation along the line of
the canal is now accomplished, and the whole work is in a great state
of forwardness. The defendants have expended, in this great and
arduous undertaking, upwards of $828,000, and they say, in their
answer, that the sum of $287,514 will be sufficient to complete the
canal, and to pay all outstanding balances to contractors and workmen
of every description.

Under these circumstances, and after such an immense expenditure
of money in a great and laudable undertaking which does honor to
the state and promises much public utility and benefit, it is seriously
to be lamented that this controversy should have arisen between the
two corporations; and the greatest caution is necessary before this
court should interfere, in the summary but powerful way of an injunc-
tion, to suspend the progress of the defendants in the completion of
their canal; or take any step which may have a tendency to excite
serious doubts or alarm in the public mind as to those rights of the
respective companies which are essentially necessary to their pros-
perity and success.

Some of the questions raised on the argument strike at the vital
interests of the respective corporations, and even at their legal exist-
ence. It is contended, on the part of the defendants, that the incor-
poration of the Society for Establishing Useful Manufactures is actually
dissolved, and that the society, as a corporation, is extinct, so far as it
respects all legal rights and powers. If this objection is well founded,
it is clear that the society is assuming a character which does not
belong to it, and, if so, that it is not entitled to the relief which,

lands could not bring ejectment for them.    *Den* v. *Morris Canal &c. Co.*, 4 *Zab.* 587.

The object of this suit probably was to compel a recognition of the obligations of the agreement of 1836.

In 1847, the society brought an action for damages against the canal company for the erection of the wall and so diverting the waters of the streams or water-courses from the canals of the society, and preventing them from flowing to those canals as of right, as they alleged, they ought to have flowed.    To the declaration in that suit the company interposed a demurrer, and the cause appears to have proceeded no further.

In December, 1853, the society brought another action, in the supreme court, against the canal company, for damages for diversion of the water.    In this suit the canal company pleaded the plea of the general issue, and the suit was no further proceeded in.

---

as possessing that character, the society might otherwise be entitled to.

It is not pretended that the society was not duly incorporated and organized; but the objection is, that the corporation has, by subsequent events, become dissolved; and the facts from which a dissolution is inferred are said to be, that they have discontinued and ceased, for now upwards of thirty years past, to carry on the business of manufactures; that they have actually relinquished and abandoned all intention of resuming or carrying them on in future, and that they have perverted the institution from its original design, by confining their operations to creating water-power and leasing out sites and water privileges for manufacturing establishments, instead of employing a part of their capital in establishing and carrying on the business of manufactures.    And it is contended that a corporation is always created upon a trust, and that, if that trust be broken, the charter is forfeited; that here the trust was, that they should establish and carry on the business of manufactures.

But a corporation may exist without exercising its corporate rights; and the mere omission of a corporation to exercise some of its rights and powers is no cause of forfeiture of its charter, much less will such an omission work a dissolution of the corporation.    Even a corporation, being disabled to act by a judgment of ouster against the persons claiming in fact to be the mayor and aldermen, has been held not to be dissolved, but dormant, and their former rights remain.    3 *Burr.* 1866.

Their not carrying on the business of manufactures is a mere neglect or omission to exercise a corporate right, and is no more than a *non-user* of that privilege; and, by the 37th section of the charter, it is expressly

From that time to September, 1876, no action was brought in any court by either party in respect to the subject of controversy. At that date a suit was brought (the action being on the case) in the supreme court, by the society, against the complainants in this suit, for damages (laid at $50,000) for diverting the water, from April 1st, 1872, to the commencement of the suit, and carrying it away and disposing of it to their own use, and so hindering its flow in the natural channel to the works of the society. The complainants pleaded to the merits, and an order for a struck jury was obtained by them, and they, then being a corporation located in another state, removed the suit by petition to the circuit court of the United States. The suit was not pursued in that court, and in September, 1877, the society brought another action on the case in the supreme court, against the complainants, for like injury from, and only from, the time of commencing the suit in 1876, a period of one year. The

provided, that the charter shall be construed in the most favorable manner for the society, and that any *non-user* of the privileges thereby granted shall not create any forfeiture. The legislature itself, therefore, contemplated the happening of such a state of things as might make it advisable for the society not to exercise all their rights and powers, and their relinquishing or abandoning for the present the carrying on the business of manufactures, is a mere *non-user* of that privilege, and they may, whenever circumstances shall make it their interest to do so, again resume it. This society was not intended to be a mere temporary institution, but a permanent one, and of general interest, and it was necessary, therefore, that after manufactures were introduced and established, and a large population had become deeply interested in the continuance of the society and of course in the continuance of all its chartered rights, that no *non-user* by the society should create a forfeiture of its charter.

Nor has the society, in my opinion, by employing their funds in improving the natural advantages of the district, by increasing their water-power and multiplying seats for manufacturing establishments, and granting leases for manufacturing purposes to individuals and private companies, either abused their corporate powers or perverted the institution from its original design. A right to improve their estate and to sell, lease or otherwise dispose of their property, is incident to all corporations, unless restrained by the provisions of their charter, and the society, as the proprietors of the lands, had a clear right, without the grant of an express power for the purpose, to have done all those things. But the legislature has expressly granted to the society not only a capacity *to acquire and hold lands,* but to sell, grant, demise, alien

damages therein (to avoid a removal of the suit to the federal court) were laid at $490. The complainants pleaded the general issue therein and applied for a rule for a struck jury, which was granted, and the cause was noticed for trial before the Passaic circuit court, the trial to take place on the 8th of January, 1878. The further progress of that suit was stayed by the injunction in this cause.

The complainants, by their bill, pray that they may be protected by the decree of this court in the use and enjoyment in their canal of the waters of the Rockaway, Pompton and Pequannock rivers and the other tributaries of the Passaic, in the same manner and to the same extent as the canal company before the lease, and as they have since then (as they allege) enjoyed them; such enjoyment by the complainants and their lessors having, as they say, continued without interruption for more than thirty years; that the society may be enjoined from setting up or asserting any

---

and dispose of them; and without a power to improve and sell or lease, I would ask, what would have been the condition of the town of Paterson, in comparison with its present condition? Where its 8,000 souls —its cotton and iron business, and its various other branches of manufactures now successfully carried on there? Without those rights and powers all the natural advantages of the place—this important stream of water, capable of supplying numerous manufactories, and thereby furnishing employment for many thousands of men, women and children, must have been held by the society, a monopoly of privileges and advantages, without a capacity to use them, or power to permit others to do it. The society has, by the exercise of this power and the judicious management of its funds, actually introduced and established manufactures—excited numerous individuals to enterprise and industry—drawn into the district capital and manufacturers, and built up a large flourishing town, and thereby greatly added to the wealth and population of New Jersey, and elevated her character in the Union as a manufacturing state. And I have not any doubt that the population, active industry and wealth of the district have been much better promoted, and the interest of the state infinitely more advanced, by the employment of the funds of the society in increasing their water-power, creating advantageous sites for factories, and otherwise improving the great natural advantages of the place, than if the society had employed its capital in erecting buildings, digging and establishing navigable canals, and carrying on, themselves, the business of manufactures. And I cannot consider the employment of their capital in the way in which it is employed either an abuse of power or a perversion of the end of the institution.

Lehigh Valley R. R. Co. v. Society &c.

claim to the water against the complainants by reason of the matters alleged in the bill, and that they may be restrained from prosecuting the suits at law, and they pray relief generally. By the bill, they insist that the right of the canal company to the use of the waters of the Rockaway, Pompton and Pequannock rivers, as it existed when the suits in this court, particularly that of 1845, were brought and prosecuted, has become settled and established by the charter of the canal company; by grant and prescription; by long submission by the society to the decisions of this court; by their long acquiescence since the decision of the suit of 1845, and their not having, for more than twenty years, prosecuted the undetermined actions at law against the canal company; and that the society ought, in equity, to be prevented from calling the right in question and from re-asserting the claims which the complainants insist were so long ago determined against them, and which, the complainants allege, were so

But if the society has forfeited its charter by an abuse of power, or by a perversion of the design of the institution, or by the breach of any implied trust or contract, or in any other way, this court has no jurisdiction to try the question of forfeiture, or to examine into and decide on it in this collateral way. A forfeiture does not, *ipso facto*, occasion the civil death or dissolution of the corporation. It does not thereby become extinct and incapable of asserting or defending its rights, but continues an existing corporate body, both in law and fact, until dissolved by some legal proceeding, and in no case of a forfeiture is a corporation dissolved without a judgment in a court of law, at the suit of the state to enforce the forfeiture.

If, therefore, the society has incurred a forfeiture of its charter, and the state does not elect to take advantage of it, the defendants cannot, and the distinction attempted to be made between the case of a corporation coming to assert a claim of right and that of a corporation claiming, as defendants, a mere exemption from liability, is fallacious and unsound, when applied here.

Nor is there any foundation for the argument that the society has done acts equivalent to a surrender of its charter. A corporation may, undoubtedly, surrender its charter into the hands of the government from which it was received; but then the government must give its assent to such surrender. But there is no proof whatever that any such surrender has ever been offered. The minutes of the society only prove that the directors once called the stockholders together, to take into consideration the expediency of dissolving the society, but there is no evidence that the stockholders ever agreed to such a proposition. And there is not, in my opinion, the least ground for the pretence that

long ago abandoned by them; that the supplement of 1836 to the canal company's charter, was an important addition to their franchises, the exercise and enjoyment of which necessarily required the use of the waters of the tributaries of the Passaic; and that it was passed not only with the consent, but with the active aid of the society; and that the expenditure consequent thereon in the construction of the works of the canal company to avail themselves thereof, was incurred with the knowledge, and the works constructed with the consent of the society; that that supplement contained no restrictions on the use of the franchises thereby granted; that the complainants relied on the supplement, and the large works constructed by the canal company, for the enjoyment of the privileges thereby granted, when they took their lease in 1871, and incurred the heavy obligations which they then took upon themselves in consideration of the lease; that if the society be now permitted to assert and

the society, as a corporate body, is dissolved, or has no legal capacity to assert and maintain its rights.

But the complainants have retorted this objection on the defendants and deny that they are a legal existing corporation. This I consider a very singular objection to come from the complainants, when the bill is against the defendants in a corporate capacity, and for acts done by them in that capacity, and not against defendants in their individual characters, for if they are a corporation for the purpose of being made defendants, surely they must be a corporation for the purpose of defending their acts.

Upon this bill, if the court makes an order for an injunction, it must be against the Morris Canal and Banking Company; but if there is no such corporation, who will be bound by the injunction, or who can be punished for a breach of it? A bill for relief against defendants in a corporate capacity, and at the same time charging that they have no corporate capacity, is a *felo de se*.

But there does not appear to be any solid foundation for the objection, if it could be raised on these pleadings. The answer, which is sworn to by the president of the company, expressly states that ten thousand shares were subscribed for, and ten dollars paid on each share to the commissioners; that an election of directors was duly advertised and directors elected, and that the commissioners paid over to them the subscription money. If these facts are true, and there is no reason to doubt it, the corporation was legally organized and came regularly into existence. It is true, the answer further states, that in 1827, and after the second election of directors, shareholders to the amount of six thousand shares came before the board of directors, and alleged

enforce their claims, it will destroy the canal; that the same matters involved in the existing suits at law were submitted to this court in 1845, and if the society desire to litigate them, they should do so in that suit, by supplemental bill; that the conduct of the society in bringing successive suits which were not prosecuted to final determination, but abandoned, is oppressive; and that the society have, for various reasons in the bill mentioned, no right against the complainants, under the agreement of 1836.

The society answered. There were affidavits annexed to both bill and answer. On the hearing, some were presented on the part of the complainants, to which objection was made by the defendants, and they were read subject to the objection. In reaching my conclusion I have not referred to nor read them. The defendants insist that there was no adjudication in any of the suits brought by them against the canal company adverse to their claim, whether as origi-

that they subscribed for the company and not for themselves; that the directors denied that; but it appearing to them that the shares were subscribed by irresponsible persons, they took back the six thousand shares.

There may have been, and probably was, very incorrect conduct in the commissioners, or in the board of directors, or in both; but I do not see that it proves that the corporation has not been legally organized, or that it has not now all its corporate rights and powers. The commissioners could not have authorized any persons to subscribe for the company, for the corporation was not then in existence; and if the directors have done an improper act in returning the subscription money on the six thousand shares, they may, in doing so, have committed a very improper act, and have been guilty of a breach of trust; but such breach of trust cannot operate a dissolution of the corporation.

These preliminary objections being removed out of the way, I proceed to consider the rights of the respective parties to the use of the waters in question, or so far as is necessary in order to dispose of the present application.

The river Passaic, at the great falls, is a private and not a public river. The great falls are several miles above tide-waters, and the river is not navigable there, nor has it ever been used for the purpose of navigation, and it was not made a question upon the argument but what the river, at the place where the society is carrying on their operations, is capable of being held, and is now held and enjoyed by the society, as private property. And, as owners of the lands, the society has a clear and undoubted right, in my opinion, to the flow of all the waters

nally made, or as insisted upon under the agreement. It appears, however, that they did not prosecute to final decision any of the suits, except the action of ejectment. In his decision in the suit of 1845, Chancellor Halsted expressly left them to their remedy at law. They appear to have subsequently brought two suits for damages against the canal company, in respect to the use of the water, but did not prosecute either one to judgment. Whether their conduct, in bringing those fruitless suits, renders the present litigation liable to be regarded as vexatious, I do not consider it important now to determine. There are other considerations which, in my judgment, are conclusive of the question now before me. From 1853 to 1872, nineteen years, no action was brought by the society against the canal company in respect to the water, and it may be assumed that during that period there was no cause of complaint. Mr. E. Boudinot Colt, governor of the society, says,

---

of the Passaic, at the great falls, in their ancient channel, without *diminution or alteration.*

Every owner of lands has a right to the use of the waters flowing through them, and may, by occupancy, appropriate the waters to his own use, if in doing so he does not injure some other proprietor. Judge Blackstone says (2 *Bl. Com.* 403): "Thus, too, the benefits of the elements, the light, the air and the water, can only be appropriated by occupancy. If a stream be unoccupied, I may erect a mill thereon and detain the waters, yet not so as to injure my neighbor's prior mill, or his meadow, for he hath, by the first occupancy, acquired a property in the current. This doctrine is fully supported by *Cox* v. *Mat thews,* 1 *Vent.* 237.

So in *Brown* v. *Best,* 1 *Wils. Ch.* 172, which was a special action upon the case for diverting a water-course, it was held by the court that the defendant in whose grounds the water took its rise might cleanse his pits, keeping them as they were, but could not enlarge them so as to *diminish* the quantity of water.

In *Beasly* v. *Shaw,* 6 *East* 208, it was held that every man has a right to have the advantage of a flow of water in his own land, without diminution or alteration ; but that an adverse right may exist, founded on the occupancy of another ; that twenty years' exclusive enjoyment of water, in any particular manner, affords a conclusive presumption of right in the party so enjoying it, derived from grant or an act of parliament. And in *Wright* v. *Howard,* 1 *Sim. & St.* 203, the principle is distinctly laid down by the vice-chancellor that "every proprietor has an equal right to use the waters which flow in the stream, and consequently no possessor can have a right to diminish the quantity of water, or to

Lehigh Valley R. R. Co. *v.* Society &c.

in his affidavit appended to the answer, that from 1864 to 1872 he neither heard of nor observed any scarcity of water for the society's lessees, although the amount let out was much increased, and during a portion of that time business was very brisk, and the mills were driven at their full capacity. Romulus Vreeland, in his affidavit annexed to the answer, says that from 1864 to 1873 the mills, driven by the power furnished by the society, were run on full time, and used water freely, and he says he recollects that during those years, and up to 1872 or 1873, there was no noticeable scarcity of water; that in 1872 he noticed, in a dry season, that there was a "sudden shortening" of the water, which lasted about two weeks. John Ramage, in his affidavit, also annexed to the answer, says that from 1865 to 1874 he recollects no shortness of water, except two or three days in 1866, and in 1874. It would seem, then, that up to 1872, at least, the society had no cause of complaint against

use it to the prejudice of any other proprietor, nor to throw the water back on the proprietor above, or to divert it from the proprietor below without a grant, or twenty years' enjoyment, which is evidence of a grant. But no action will lie, except by a person who sustains *an actual injury.*" This is the sound and rational doctrine which is supported by all the cases in the English books. Every proprietor has an equal right to the use of the water of a stream or river, and no one has a right to use it, different from what he has before used it, to the prejudice of any other proprietor. The first proprietor, therefore, who erects a mill and dam does not thereby acquire a right to use the water to the prejudice of his neighbor's meadow, for so far his neighbor is the first occupant; but he may detain the water and use it if his neighbor's meadow sustains no *actual injury thereby,* for no action will lie except by a person who sustains *an actual injury.* The right which the proprietor who first erects his mill and dam acquires by occupancy, is only a right not to have his mill prejudiced by the use of the water by any subsequent mill or for some subsequent purpose; for, as against such subsequent mill, or such subsequent use of the water, he is the first occupant, and his neighbor has only a right to the use of the water as he before used it, unless he can so use it as not to prejudice his neighbor's prior mill. Every proprietor, therefore, who claims a right, either to throw the water back upon the lands of his neighbor above, or to diminish the quantity of water which has usually descended to the proprietor below, must prove either a grant or license from such proprietor, or twenty years' uninterrupted enjoyment.

In *Platt* v. *Johnson & Root,* 15 *Johns.* 213, it was held by the supreme court of the state of New York that a person erecting a mill and dam

the canal company, in respect to diminution of the flow of water, and that for nearly twenty years, from 1853 to 1872, the society and the canal company made use of the water, without any cause of complaint on the part of the former against the latter. The complainants, however, it should be remarked, insist that the state of the water from 1864 to 1872, is no test of the society's right, but that the criterion is its state in 1836. According to the answer, about 1864 the society increased the height of their dam across the Passaic, three feet, and by that means erected a large reservoir, capable of containing nearly seven million cubic feet of water, and the result was such an increase of their power at Paterson as substantially to double it. The complainants insist that this increased amount of water at Paterson came, not from the raising of the dam, but from their stores of water provided for their canal, and that they ought, in equity, to be protected against being held liable, at law, for

upon a stream of water, does not, by the mere prior occupancy, unaccompanied with such a length of time as that a grant may be presumed, gain an exclusive right, and cannot maintain an action against a person erecting a mill and dam above his, by which the water is in part diverted, and he is in some degree injured. This decision does not appear to me to be in accordance with the English decisions. But in that case there was no claim of right set up by the defendant to divert the natural course of the stream, and the mill erected by the defendant was only in its consequences injurious, in some degree, to the plaintiff's mill.

In the present case the society has appropriated, by occupancy, the whole water of the Passaic river, for manufacturing purposes, as they had a right to do under their charter, and the Morris Canal and Banking Company set up no adverse right, founded on any previous grant, or on the occupation of themselves, or any other under whom they claim, and the society has been in the peaceable enjoyment of the waters for upwards of twenty years.

I consider it, therefore, as clear, that the society has a right, as riparian owners, to the flow of the whole of the waters of the Passaic river, in their ancient channel, down to the great falls; and the Morris Canal and Banking Company cannot divert the waters of the Rockaway, by which the waters of the Passaic at the great falls will be diminished, without encroaching on the rights of the society.

Then the next question is, whether the Morris Canal and Banking Company has a right, under or by virtue of their charter, to divert the waters of the Passaic river, making just compensation to the society

Lehigh Valley R. R: Co. *v.* Society &c.

damages for not continuing to contribute to the society that to which, they allege, the latter were never entitled, and to which, they say, neither the complainants nor their lessees ever undertook, or were under any obligation, to contribute.

But the question, whether the state of the water in 1872 is properly to be regarded as a criterion or not, is not important to the present consideration; for, whether it be or not, it appears that, up to that year, the two parties were able to use the water together, without prejudice to the interests of the society.

The interests, public as well as private, dependent upon the use by the complainants of the water, are very great, and it is manifest that both parties may make use of the water without prejudice to the rights of either. It is the duty of a court of equity, and it alone is competent to the work, to regulate the use of water among those who are entitled to the use of it in common, in such manner as to preserve the

for any actual injury which they shall sustain, and this is a question of the greatest moment to the society.

The defendants contend that the charter of the society does not confer any right or power to enter upon, use or enjoy any streams of water or water privileges for manufacturing purposes, without the voluntary consent of the previous owners thereof, and that the society are left to acquire such streams of water and water privileges, and, when acquired, to hold and enjoy them according to the terms of their contracts with such previous owners, under the ordinary protection of law, and with no special immunities whatever. And the defendants claim to have a constitutional and legal right to take and use the waters of the Passaic river and tributary streams for the necessary purposes of their canal, upon making compensation.

Certainly, the charter of the society does not confer on it any right to appropriate to its own use, without the owner's previous consent, any stream of water, or water privileges, for manufacturing purposes. The legislature itself cannot take private property for public purposes, without just compensation; and it never has been pretended, that I have heard, that the society has a right to take either lands or water for the purposes of manufactures, without the consent of the owners thereof. *But the legislature has granted to the society a capacity and right to acquire, and, when acquired, to hold, possess and enjoy, such streams of water and water privileges as are necessary to carry into effect the objects of their charter.* The society is a civil corporation for private purposes, though, at the same time, deemed to be connected with the public good; and the society could not, therefore, have expected, nor could the legislature have intended to grant them, a right to take private property for

11

rights of each. *Belknap* v. *Trimble*, 3 *Paige* 577; *Ballou* v. *Inhabitants of Hopkinton*, 4 *Gray* 324. Said the court in the latter case: "In regulating the rights of mill-owners and others in the use of a stream wherein numbers of persons are interested, equity is able by one decree to regulate their respective rights, to fix the time and manner in which water may be drawn, and within what limits it shall or shall not be drawn by all parties, respectively; and this is peculiarly adapted to the relief sought against nuisance and disturbance, and affords a more complete and adequate remedy than can be afforded by one or many suits at law." The language of the same court, in *Boston Water Power Co.* v. *Boston & Worcester R. R. Corp.*, 16 *Pick.* 512, 526, is precisely in point: "Without going at large into the authorities, the court are of opinion that this is a case where the rights of the plaintiffs being fixed and settled by the statutes, where both parties are corporations claiming certain

---

manufacturing purposes, without the previous consent of the owners. But as the navigable canals contemplated by the charter were to be, like turnpike roads, common highways for the public to use, paying reasonable tolls, a right and power is given to take lands and water for that purpose, without the previous consent of the owners, on making compensation as provided for in the charter. But when the title is once acquired, what difference does it make, as to the rights of the society to hold and enjoy the property, whether the society acquire their title by purchase, with the voluntary consent of the former owners, or by the compulsory mode mentioned in the defendant's charter? I can discover none, nor do I believe that there is any, in reason and common sense. And when the society acquired a title to the lands, they acquired a right to appropriate and use the waters for manufacturing purposes, without any special grant in their charter of a right to do so. And a right to hold and enjoy is an immunity expressly granted to them.

The argument of the defendants amounts to this: that the legislature has granted to the society a privilege and power to acquire all the rights of property necessary for carrying on manufactures; but that the legislature has granted the society no protection or security for a continuance of the enjoyment of such property; and that, therefore, the legislature was at liberty to grant to another corporation a right to take it away, for other purposes, on making compensation to the society; and which power the legislature has exercised. And the defendants boldly contend for an unlimited right to take the whole waters of the Passaic, if necessary, for the purpose of their canal; and, if their argument be well founded, the Morris Canal and

---

Lehigh Valley R. R. Co. *v.* Society &c.

---

rights, but claiming them as granted by the public, and to be exercised and carried into effect for the use and benefit of the public, it is fit that the plaintiffs, instead of being left to a suit at law, in which relief in damages only could be obtained, should be entitled to the more adequate and complete remedy furnished by a court of equity, where the relative rights of the parties, with their just limits and qualifications, may be declared and fixed, and under which the parties may enjoy, specifically, the very rights, immunities and franchises which the public intended to grant to them, respectively, with an ultimate view to the public benefit and accommodation.    A suit at law would only enable the plaintiff corporation to recover and distribute a sum of money, by way of damages for the violation of those rights, among the members of that corporation, as individuals, but would not empower them to accomplish the specific public objects for attaining which these franchises were conferred on them."

---

Banking Company has the right to take the waters of the Passaic, in the first instance, without having recourse to the waters of the Hopatcong lake at all.

But can this be possible?    Can it be, that the legislature intended, and the society so understood it, that after hundreds of thousands of dollars had been expended in a hazardous but important undertaking; and that after the object had been accomplished, and a large and populous manufacturing town had grown up, the whole water-power of the society, on which their prosperity, and the prosperity of the town, entirely depend, may be destroyed, and the water taken for a canal? It would have been madness and folly for the society to have invested their money under such an insecure charter; and if the legislature possessed the right contended for, the exercise of it would be an unexampled instance of legislative oppression and cruelty.

But this, in my opinion, is not the fair and reasonable construction of the charter of the society; nor did the legislature intend to put it in the power of the defendants to take from the society their water-power, whereby not only the society, but the whole population of the district, would be involved in ruin and distress.    Such construction must be put on a statute as may best answer the intention which the makers had in view; and a thing which is within the letter of a statute, is not within the statute unless it be within the intention of the makers. And a statute will sometimes receive such equitable construction as is contrary to the letter.    These are familiar rules of construction ; and, in this case, it is the duty of the court to put, if possible, such a construction on the two charters as will prevent their interfering with

The same principle has been recognized and applied in this court in the case of *Del., Lack. & West. R. R. Co.* v. *Erie Railw. Co.*, 6 *C. E. Gr.* 298, 303, 304. In that case the controversy between the parties was in reference to the use, by them, of the railroad through Bergen tunnel. That tunnel was constructed by the Long Dock Company, which company, on the 1st of November, 1859, granted to the Hoboken Land and Improvement Company and their assigns a perpetual right of way over certain lands and premises, and through the tunnel, for a single or double track railroad, including the right to use the track in the tunnel, provided that the use by the grantees should not, at any time, be such as to interfere with, obstruct, or delay the running of any trains of the New York and Erie Railroad Company, according to such time-tables as they should from time to time adopt. The rights of the Long Dock Company, at the time of the filing of the bill, were vested in

---

each other. And the fair and reasonable construction to be given to the provisions of the Morris Canal and Banking Company is, that the company shall have all the right and privilege of taking for their canal such lands and water as the legislature can grant, without violating their prior grants.

In *Wales* v. *Stetson*, 2 *Mass.* 143, Chief Justice Parsons, in giving a construction to a turnpike law, says, that the *rights legally vested in any corporation* cannot be controlled or destroyed by any subsequent statute, unless a power for that purpose be reserved to the legislature in the act of incorporation; and that, in the consideration of the provisions of any statute, they ought to receive such a reasonable construction, if the words and subject-matter will admit of it, as that the existing *rights* of the *public* or of *individuals* be not infringed. And, in that case, the court held that the proprietors of a turnpike road have no authority to erect a gate upon an existing highway, unless *specially authorized* by the legislature. And the same learned judge says, in *Coolidge* v. *Williams*, 4 *Mass.* 145, "that private statutes, made for the accommodation of particular citizens or corporations, ought not to be construed to affect the rights or privileges of others, unless such construction results from express words, or from necessary implication."

If the court will restrain the construction of general words, so that the existing rights of the public or of individuals will not be infringed, certainly the reason is much stronger for restraining the construction of general words, so that rights held under prior grants will not be infringed.

A charter to a corporation is in the nature of a contract, and when rights have become vested under it, the legislature cannot divert those

the Erie Railway Company, and those of the Hoboken Land and Improvement Company in the Delaware, Lackawanna and Western Railroad Company. In that case the chief justice, who sat for the chancellor, said in reference to the question in the cause relating to the relative rights of the parties to the use of the Bergen tunnel : " It was insisted that over a matter of this kind this court had no jurisdiction. The bill asks that, if deemed necessary, regulations should be established by this court, controlling the use, by these companies, of this tunnel, and that a receiver should be appointed to oversee the execution of such regulations ; and it was the existence of this power which was denied on the side of the defendants. I have examined the cases cited, but have not found that any of them sustain the objection. * * * * In the case before me these parties possess a community of interest in this property. They are tenants in common of an easement, and if this court cannot protect the one against

---

rights, and they would remain though the charter were repealed. The right to the use of the waters of the Passaic, is legally vested in the society, as a corporation ; and the court will never put such a construction on general words, in a subsequent charter, as will interfere with and injure that right. The legislature could not, in good faith, have intended that; and it would, therefore, be highly indecorous and improper for a court to put such a construction on the act. We are told by Blackstone, in his commentaries (1 *Bl. Com.* 91), " that where some collateral matter arises out of the general words, and happens to be unreasonable, there the judges are, in decency, to conclude that this consequence was not foreseen by the parliament, and, therefore, they are at liberty to expound the statute by equity, and only *quoad hoc* disregard it."

The construction contended for by the defendants is highly unreasonable, and no one can for a moment believe that the legislature, by the charter to the Morris Canal and Banking Company, intended to grant them a right to interfere with and materially injure the water-power of the society. Suppose, when the application for that charter was made, the legislature had been asked—Do you mean or intend to confer on the Morris Canal and Banking Company an unlimited right to take the waters of the Passaic river, if necessary, for the purpose of their canal, and thereby injure the manufactories at Paterson?—I dare to assert, that there was not a single individual of that body but who would have rejected such an idea with indignation. And nothing short of clear and express words could justify the court in giving to that charter such an unreasonable construction.

the injustice of the other, the party whose rights are
invaded is clearly without any adequate remedy, for it is
certain that either of these companies, thus situated, can so
act with respect to the common easement as to render it
worthless to the other, and thus bring upon the latter incal-
culable mischief.   The general cognizance of equity in cases
of this kind, where property is enjoyed in common, will not,
it is presumed, be disputed by any one, and I can perceive
no reason why this power should not exist where two rail-
roads are such tenants in common, as well as in other cases.
In truth, as these companies, although technically private
corporations, are in some measure public agents, there exists
in such cases as the present, an additional reason why a
judicial control should be extended, as far as possible, over
their conduct towards each other.   I have no doubt as to
the jurisdiction of this court over this subject, and shall not
scruple, therefore, to exercise it to the fullest extent that

The faith of the state, for the inviolability of the rights of the society
acquired under their charter, is as solemnly pledged to the society as
it is to the Morris Canal and Banking Company for the protection of
their canal.   Where is the express provision in the charter of the Mor-
ris Canal and Banking Company, that, after they have cut their canal
and expended their million of dollars in filling it with the waters of
the Hopatcong lake, the waters of that lake shall not be granted by the
legislature for some other purpose?   The guaranty is only an implied
one, arising from the nature of the grant; but the faith of the state
would be as grossly violated by the breach of that implied contract, as
by the breach of an express one.

   The right to hold and enjoy such lands, tenements and heredita-
ments as shall be needful for carrying on manufactures, is fully and
clearly granted to the society, by a charter-right, and if it is not secured
to them by their charter, I know of no right that is.   If you may take
their water, you may take their lands; and if you take their water and
lands, what rights have they left, that are worth contending for?

   The. society do not and cannot claim, under or by virtue of their
charter, a right to take the waters of the Passaic, without first acquiring
such right by purchase ; but they do claim, under and by virtue of their
charter, a right *to acquire, hold and enjoy* those waters for manufacturing
purposes.   And when thus acquired and held, can they be taken away ?
Why give the society a right to acquire those waters, if, when acqu're l,
they may be taken from them?   If those waters were necessary to
enable the society to introduce and establish manufactures, the use of
them is equally necessary to enable the society to continue to carry
them on.   The very object, spirit and essence of the contract between

the circumstances of the case may now, or at any time here-
after, appear to require."

It is very manifest that this is a case in which it is par-
ticularly incumbent upon this court to intervene. Both par-
ties are in the exercise of franchises granted by the legis-
lature for the ultimate benefit of the public, and both are
accordingly engaged in business of great importance to the
public. The complainants claim the right to the use of the
water, not only under legislative authority, but under such
authority obtained with the consent of the defendant. The
interruption of the business of the complainants would be
a public as well as a private injury. In the suits at law,
the society, by establishing their claim against the complain-
ants, would only recover damages for past injury. They
cannot in those suits obtain any guaranty for the future.
Already there are two of those actions in progress. There
may be more. If the society's rights have been invaded,

---

the state and the society, is the implied guaranty that the society may
hold and enjoy everything necessary to carry on the business of manu-
factures.

In my opinion, then, the society has, by their purchase and occu-
pancy, acquired, under and by virtue of their charter, a right to the
use of the whole of the waters of the Passaic, at and above the great
falls; and the Morris Canal and Banking Company has no authority
or right, by their charter, to encroach on the rights of the society, by
diverting the waters of the Rockaway, which is a principal branch of
the Passaic, or in any other way, by which there will be a *diminution*
of the quantity of water at the great falls.

But the society has no right to the waters of the Great pond, or any
other waters which do not flow into and increase the waters of the Pas-
saic above the great falls, and which the society has not appropriated,
by occupancy, to the purposes of manufactures. The right granted to
the society, and not used, of cutting navigable canals, cannot operate
as a restriction upon the power of the legislature to grant canal char-
ters; and, especially, after such a lapse of time; and a charter having
been granted by the legislature to the defendants, who have appropri-
ated the waters of the lake to the purposes of the Morris canal, the
use of those waters is secured to the defendants by their charter. And
any claim set up by the society, of a right to cut navigable canals
wherever and whenever they please, in the state, is extravagant and
unfounded. The society has no right to cut a navigable canal but "for
the purpose of transporting goods, wares and merchandises to and from
some manufactory by them established" in the district; and if, here-
after, the society exercise this right, they must do it without infringing

this court is able, by a single suit, to ascertain and award damages for injury to them in the past, and to secure protection to the society therein for the future, and it can, at the same time, secure to the complainants their rights, providing for the peaceable enjoyment, by both parties, of their respective rights, whatever they may be. In view of the magnitude of the interests involved in the controversy, and the importance of constantly securing to each party their entire rights; and in view of the equities which the complainants set up, arising out of various transactions, covering a period of half a century, and consisting to no small degree of equitable estoppels, and in view of the liability of the complainants to a multiplicity of suits at law, it is incumbent on this court to draw the controversy into this forum for determination.

Equity will interpose to protect and secure the enjoyment of franchises granted by the legislature, on the ground that

---

on the prior rights of any other corporation that shall have appropriated, by virtue of their charter, any particular waters to their use.

The defendants admit, in their answer, that they have erected a dam and other water-works on the Rockaway river, near Dover and Powerville and other places, for the purpose of diverting into their canal such of the said waters as may be necessary, in order to carry into effect the objects of their incorporation. But they aver that the quantity of water passing into the falls by the natural current of the Passaic and its tributary streams will not be in any degree diminished by the canal, inasmuch as the waters to be drawn from the Hopatcong and those from one of the head branches of the Raritan river, after passing through and supplying the canal to Dover, will be there let into the Rockaway, and will thus introduce into the bed of the river as much water as will afterwards be taken from it, or from any of its tributary streams, for the purposes of the canal. And they further aver, that by means of the dam at the outlet of the lake, which has been raised by the defendants five feet above its former height, and which they contemplate, if necessary, to raise still higher, an extensive reservoir has been formed; and by the additional reservoir which, if necessary, they design to form, by a dam to be constructed at the outlet of Green pond, an *extra* and very considerable supply of water will be insured in time of drought, as well to the Morris canal as to the manufactories on the Rockaway and Passaic rivers, thereby obviating, in a great degree, the inconvenience to be apprehended from a scarcity of water during the summer months.

The question then is, Will the works which are begun, and are now in progress, for supplying the Morris Canal with water, occasion, if

Lehigh Valley R. R. Co. *v.* Society &c.

it furnishes the only complete and adequate remedy. *High on Inj.* §§ 570, 571, 572. The case of *Mercer & Somerset R. R. Co.* v. *Delaware & Bound Brook R. R. Co.*, decided in this court in 1875, furnishes an instance of the exercise of the jurisdiction of this court in controlling the action of contesting corporations in the conflict of their franchises granted by the legislature.

Where the party complained against professes to act by public authority to enter upon, and, to a certain extent, to use the land of other persons, and exceeds his authority, it is held to be a peculiarly proper case for the interposition of a court of equity. *Boston Water Power Co.* v. *Boston & Worcester R. R. Corp., ubi supra; Agar* v. *Regent's Canal Co., Cooper's Eq.* 77.

There is still another and cogent reason for drawing the litigation between these parties into this court. As before stated, the relations between the society and the canal com-

completed, a diminution of the quantity of water in the Passaic river at the great falls? The defendants have a right, in my opinion, to acquire, in the manner authorized by their charter, and to use, the water of the Passaic, if they can do it without prejudice to the rights of the society, who can have no serious ground of complaint, unless they sustain an *actual injury*, which they would do by a *diminution* of their *water-power*.

Whether Lake Hopatcong and the other means which the defendants contemplate resorting to for the purpose, if necessary, will supply a sufficient quantity of water for the whole length of the Morris canal, is a question which cannot now be satisfactorily solved, so as to justify the interference of this court.

It has been confidently asserted, both before the commencement of the canal and at the present time, that the supply of water from the lake will be much more than the canal will require. This is asserted by the defendants in their answer; and the commissioners appointed by the legislature to visit the canal, and who reported to the legislature at their last session, state, in their report, that the information afforded them, and their own observation, fully concur in the belief of the abundance of the waters of the lake, at all times, for the purposes of the canal. But, admit the question to be doubtful, the injunction ought not to issue. The route of the Morris canal has long since been known to the society; large sums of money have been expended, and the canal is now in a great state of forwardness. Under these circumstances, it would not, I think, be a sound exercise of discretion for the court to interfere, on the ground of apprehended danger.

pany, in respect to the use of the water, have existed for
more than half a century.   Three suits have been brought
in this court on the subject.   In disposing of the question
between the parties, resort must be had to the pleadings
and testimony in those causes.   They are here.   And fur-
ther, in view of the character of the subject-matter of the
controversy, this is a more appropriate forum for the deter-
mination of the questions between the parties than a court
of law.   More deliberate consideration can be given to it
here than can be given to it by a jury.   A matter so com-
plicated and involved will be better decided by this tribunal
than by one in which there is less opportunity for consider-
ation and deliberation, both in the conduct of the litigation
and in the decision.   In *Black* v. *Shreve*, 3 *Hal. Ch.* 440, 457,
the complexity of the covenant, and the multiplicity of suits
to which it might give rise at law, were regarded as

---

Here the question is, whether the works of the defendants will or
will not be a nuisance to the society.   *In a plain case of nuisance*, the
court will interfere by injunction, and will not suffer the nuisance to
go on, to the prejudice of the party complaining.   But I cannot grant
the injunction upon assertions, calculations and mere speculative
opinions, and where the injury to the defendants might be irreparable
if the court should mistakenly interfere.
It is a circumstance of considerable weight, in my mind, that in
December, 1826, Mr. Colt, the governor of the society, in a letter
addressed to Mr. Colden, president of the Morris Canal and Banking
Company, objected to the present location of the Morris canal, only on
the ground that this route would not afford the expected accommodation
to the town of Paterson, and in respect to the water he says : " *I am
led to believe*, from what I hear, that you will take more water to supply
your level to pass this, than you bring from your summit level, and of
course to our injury."   From which it appears that Mr. Colt is himself
doubtful whether the Morris Canal and Banking Company, in using
the water of the Rockaway, will take more water than they bring from
the summit level, and that he did not object to their making use of
the water, if the defendants would adopt the lower instead of the
upper route.   He says that he is led to believe that they will take more
water than they will bring, but he does not positively assert that such
will be the fact.   This is a particular case, attended with special cir-
cumstances, and where no *actual injury* has been sustained, but only
danger apprehended.   The defendants must, therefore, be left to pro-
ceed at their peril.   The complainants have now given them notice,
by their bill, of their rights, " and stronger notice by this motion ; if
they do wrong, it is at their peril."   See *Att'y-Gen.* v. *Doughty*, 2 *Ves.* 453–4.
The injunction is refused.

grounds on which this court might properly entertain a bill for the adjustment, in one suit, of the contribution called for by the covenant.

The motion to dissolve will be denied, with costs.